## Case No. 6,912.

### The HUNTRESS.

[1 Phila. 122; 7 Leg. Int. 202; 4 Pa. Law J. Rep. 510; 3 Am. Law J. (N. S.) 307.]

District Court, E. D. Pennsylvania. Dec. 9, 1850.[1]

SALVAGE—COMPETENCY OF WITNESSES — WHAT IS SALVAGE SERVICE—COMPENSATION.

[1. A vessel rescued by a British naval vessel, and sent home in charge of an officer, was libeled for salvage; the officer suing for himself, and the British consul joining with him "for all other interests." *Held*, that while it would have been more regular to set forth the names of the other parties interested, or otherwise designate them in the caption, the defect was merely formal, being adequately supplied by the body of the libel.]

[2. A British naval vessel encountered, on the northwest coast of Africa, an American brig flying a signal of distress. The brig's captain was dead, and her mate dying of coast fever; and her crew, being ignorant of navigation, and worn out with fatigue and anxiety, were sailing at random along the coast. An officer was put on board, and the brig conducted to Fernando Po, where medical attention, water, and supplies were furnished by the British vessel. The brig, after being disinfected, was sent home in charge of an officer, with two additional seamen. In spite of the disinfection, the officer was attacked by the fever, and, after much danger and suffering, reached the United States broken in health. *Held*, that the service was in the nature of a salvage service, and entitled to an award of one-fourth the value of the vessel and cargo.]

[3. Where a libel is filed to recover for services which are highly meritorious in their character, a party claiming to be a salvor will be permitted to testify in his own behalf, without determining, by technical refinements, whether the service was strictly a salvage service or not.]

[See The Elizabeth and Jane. Case No. 4,-356; The Boston, Id. 1,673; The Henry Ewbank, Id. 6,376.]

[This was a libel for salvage by Charles R. Robson and William Peter against the brig Huntress (John R. Rue, claimant).]

W. B. Reed and G. Harding, for libellants.
Mr. Williams and J. W. Biddle, for respondents.

KANE, District Judge. I have taken up this case out of its order on the calendar, because the transaction it grows out of was one of highly meritorious service, rendered to an American ship by the navy of a foreign power, and I understand that the officer who brought her in is remaining to represent the interests of the sailors. The libel is filed by Charles R. Robson, a lieutenant lately on board of H. B. M.'s ship Gladiator, for himself and William Peter, H. B. M.'s consul at Philadelphia, for all others interested, against the brig Huntress and her cargo, &c., in a cause of salvage, civil and marine. The material allegations which it contains are as follows: (Here the judge repeated the articles of the libel.)

The answer of the claimant, after excepting to the sufficiency of the libel, admits that the Huntress arrived at Philadelphia with Lieutenant Robson on board, as alleged in the libel; declares that her cargo was worth about eleven thousand dollars, and the vessel valued at three thousand six hundred dollars; denies knowledge of the other facts alleged, and calls for proof of them; and sets out a number of new facts, of which the respondent has been informed, which, if proved, would go to reduce the libellant's compensation. I shall consider first the objection which is made to the libel,—that it does not designate, with sufficient certainty, who are the parties on whose behalf the salvage is claimed. The objection is not tenable. One of the parties libellant (Mr. Robson) is himself a direct party in interest, and so represents himself; and the vessel, once brought into the custody of the admiralty upon his libel alone, would be retained here till all other interests had an opportunity of presenting themselves for a hearing against her. Were he the only party before me, and it came to my knowledge, either from the pleadings or the proofs, that other meritorious salvors were by force of circumstances prevented for the time from asserting their right formally against this vessel, I should have no hesitation in impounding in the registry such sum as they appeared entitled to, to await their legal demands. But this is not exactly such a case. The British consul makes himself a party "for all others interested"; and though it would certainly have been more regular to set forth their names, or otherwise designated them in the caption of the libel, yet the defect must be regarded as merely formal, since it is supplied adequately by the rest of the instrument.

The next question of law which I am called on to decide is, whether Mr. Robson can be heard as a witness. It is conceded that the services were meritorious, and that some of them approached closely to the character of salvage services; but it is contended that they do not amount to a salvage, properly so-called, and that the exceptional rule of evidence, which allows a salvor to testify in support of his own interest, cannot therefore be invoked in the case. There is no doubt a considerable part of Mr. Robson's deposition, which, as it goes to matters of hearsay and facts provable aliunde, it is my duty to reject from consideration, whether the case be one of salvage or not. But as to the rest, it matters little, in my judgment, what is the technical description of the service, if it partook so far of the character of a salvage as to imply the same necessity as that on which the rule is founded. How can it further the administration of justice between these parties, that I should refine upon the nomenclature of the law, and then reject the evidence under one artificial head of claim, that I would have accepted under another: the essential reason for my action being identical in the two cases, and having

---

[1] [Modified in Case No. 11,971.]

just the same bearing and force in each? There was supposed in former times to be a difference between the reward of salvage services and the reward of other services connected with the rescue, protection, and restoration of property. One was paid in the shape of a percentage on the value of the thing saved; the other by a quantum meruit. But this was little more than a nominal distinction; for the percentage in the one case was always measured in a great degree by the merits of the service, and the compensation in the other had more or less of reference to the value of the property. And of late years, even this formal distinction has been disregarded, and the decree of salvage is for a specific sum, as frequently as for a proportion of the value. I do not find from the books, that at any time the compensation for the two descriptions of service was ascertained by reference to differing rules of evidence; and I cannot imagine that it was so; for until the evidence had been received, it must often have been difficult to know whether the case belonged to one or the other category. This inquiry, however, is not necessarily involved in the case before me; for the facts which have the most important bearing on the claim are all of them proved, without reference to Mr. Robson. They are these: The Huntress, an American brig, trading on the northwest coast of Africa, was fallen in with by the Jackall, a steam tender to H. B. M.'s ship Gladiator. The brig had her flag hoisted, union down, the ordinary signal of distress. On boarding her, it was found that she had lost her captain, that the mate was dying with coast fever, and that her crew, entirely ignorant of navigation, were worn out with anxiety and fatigue. They had been sailing for four days at random, sometimes approaching the mainland, and then bearing away again to avoid running ashore, or to escape from piratical looking boats that sought to board them, and they were about to run into what they supposed the river Gaboon, but in fact a small inlet some two hundred miles further north, where they saw what they thought a French brig at anchor. Their vessel was a mere estray upon the ocean, at the mercy of the first finder, unless protected by his sense of justice. They were glad to give up the vessel and themselves into the charge of the commander of the Jackall, who put an officer on board, and conducted them to Fernando Po where the Gladiator was lying. Here everything was done for crew and vessel that hospitality and kindness could do, on the part of the British commodore and his officers. The surgeon came on board to the aid of the mate, but he was already dead. The vessel was supplied with water, medicines, and stores. An anchor was furnished her to replace one she had lost. The property on board was collected, carefully inventoried, and sealed up. Disinfectants were employed to remove or diminish the causes of diseases on board. And with the assent of the second mate, and in accordance with his opinion as to what was best for the owner's interest, it was determined to send her home to the United States. A lieutenant of the royal navy was placed on board to navigate her, and two men to complete her effective complement; three of her surviving company being at the time off duty in consequence of sickness. The coast fever, of which the mate, and probably the captain, also had died, is known to be in a high degree malignant. Notwithstanding the precautions which had been taken to disinfect the Huntress, and though Lieut. Robson, in obedience to the surgeon's directions, kept clear of the cabin as much as possible, sleeping on deck, and going below only to make out his reckonings, he was attacked by this disease a few days after leaving the coast, and struggled with difficulty, and through much danger against its effects until he reached this country. On his arrival here, sixty-nine days after leaving Fernando Po, he was a confirmed and broken-down invalid, so ill that his physicians considered him "unfit to be moved." It manifests a determined energy of character on the part of this gentleman, which is praiseworthy in a high degree, that in shattered and sometimes critical health, and with insubordination on the part of his only officer, the mate, he succeeded in conducting the vessel through so long a voyage safely home to her owner.

The facts which I have recited, and the few remarks I have made on them, present the three leading elements of salvage compensation in their application to the present case,—the value of the property exposed to hazard, the peril to which it was exposed, and the services by which it was saved. There is yet another element to be brought into the computation; but, before discussing it, I will take notice very briefly of one or two suggestions, that find a place in the answer, and have been expanded in the argument upon the evidence:

1. It is said that the Huntress should not have been sent home by Captain Adams, but should have been dispatched along the coast in search of a navigator, under whose directions she might have continued on her voyage. The answer is complete: 1. It does not appear by any means probable that such a navigator could have been found. 2. Had there been one, it would have been most improper to confide property consisting in great part of coin and gold, to a stranger, and transfer to him the personal trust of dealing with it at his discretion. 3. The mate, who, by the death of his superior officers, has become the owner's representative, preferred that the vessel should be sent to the United States.

2. It is said, on the authority of the mate, that the vessel had a consignee at Sierra Leone, to whom she might have been sent.

and that she had besides a consort at the island of St. Thomas, one of whose officers might have brought her home if she had been taken there. But the letter of instructions, found on board the vessel, proves that she had no consignee, and a comparison of dates shows that the vessel referred to had left St. Thomas; besides which, if these facts were otherwise, the opinions expressed by the mate, when he was called into conference with Captain Adams, would have destroyed their effect.

3. It is argued that the salvage was complete when the vessel reached Fernando Po in safety, and that the services of Mr. Robson in conducting her to the United States, were merely those of an ordinary navigator, and to be paid for as such. The evidence is, that there are but three white residents on the island, one of whom is the governor, and another the British consul; and that the mate, after making inquiry by Captain Adams' direction, found that no navigator could be procured there. It is vain to say that the service was complete under these circumstances; but that the lives of the crew were now safe from the hazards of wreck, the vessel might almost as well have been left adrift on the high seas, as abandoned at Fernando Po.

Indeed, as to this, and the other suggestions which I have noticed, I must frankly say, that had the conduct of Captain Adams been in accordance with them, it would have wanted much of the merit which I now ascribe to it. Had he sent the brig on a vague and roundabout hunt for a consignee, —expensive of course, and certainly fruitless,—or had he trusted her, with her cargo, to some navigator enlisted by chance, on a coast rife with piracy, or had he, after securing her safety, left her at Fernando Po, with her crew of half-breeds and negroes, to eat up or spoil upon the property of her owner, or had he even followed the example which was cited from our diplomatic records, and detained her while he could arrange by contract the just value of the services he had rendered, and was about to render, I apprehend that a court of admiralty would have been very reluctant, indeed, to table a large decree in his favor. It is to his praise that what he did was the reverse of all this; it was well judged, liberal spirited, sedulously protective of the interests which misfortune had cast upon him, and justly confiding withal towards the country whose citizens he had relieved or rescued. And this conducts me to the remaining consideration which should have influence on my decree. What obligations were there resting upon these salvors, to do as they have done? Absolutely none but those of human fellowship. They were strangers, subjects of a foreign power, at a great distance from home, armed and cruising for a special object, requiring their full complement of men to man prizes, and meet the ordinary casualties of a sickly climate. It illustrates well the advancing civilization of the age, that alien flags are thus summoned on distant seas to perform offices of brotherhood, and the armament of war is found ministering to the charities of man. The considerations are higher and more noble than any of policy, that prompt us to foster the spirit which these salvors manifested by their conduct. Still, the task of adapting to it a pecuniary compensation is not the easier on that account. It refers itself largely to the judicial discretion. It is impossible to find in an adjudged case circumstances altogether parallel to those of the case before us. The Charlotte Wylie, 2 W. Rob. Adm. 495, which was supposed to resemble it, was that of an English vessel, relieved and sent home by a cruiser of her own nation. Her condition, too, was much less perilous; for she had an officer of her own on board, capable of navigating her, and those who brought her to England did not suffer in health. The Amistad, 15 Pet. [40 U. S.] 518, approaches nearer to our case; but that had some of the features of a military service; there the decree was for one-third. Referring myself particularly to the opinion of the supreme court in Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, and to the remarks of Mr. Justice Washington in deciding Bond v. The Cora [Case No. 1,621], and those of Mr. Justice Story in Tyson v. Prior [Id. 14,319], I think I shall not depart widely from the principles which have governed our courts in cases of civil salvage, if I allow to the salvors one-fourth of the value of the property saved, after deducting the charges against it. These are as follows:

| | |
|---|---:|
| To Captain John Adams, of H. B. M. ship Gladiator, for an anchor, water, stores, &c., put on board at Fernando Po, £20. 3s. | $ 93 34 |
| To Lieut. Charles R. Robson, R. N., for his board here while sick, physician's bills, and passage home, £81 | 395 00 |
| To Richard Palmer, one of the seamen detached from the Gladiator, for his wages on the voyage from Fernando Po, £6; for his passage home, £5 | 53 68 |
| To Portuguese seaman (not named) who was shipped at Fernando Po, for his wages, £6 | 29 30 |
| Making of charges the sum of | $576 32 |

| | | |
|---|---:|---:|
| Deducting which from the value of the Huntress | $ 3,600 00 | |
| And her cargo | 11,000 00 | |
| | | $14,600 00 |
| Leaves | | $14,023 68 |

One-fourth part of which, amounting to $3,505.92, I award as salvage. And this sum I apply and apportion as follows, viz.: 1. To pay to the proctors and advocates who have acted for the libellants in this court, such sum as may reasonably be due to them for their services. 2. Of the residue, one-third to Lieut. Charles R. Robson, in consideration of his loss of emoluments by

reason of taking charge of the Huntress, and of his meritorious personal services in bringing her, with her cargo and crew, to this port. 3. The remaining two-thirds to Captain John Adams, and the officers and crews of the Gladiator and Jackall, including herein Lieut. Robson, to be distributed according to the regulations and usages of H. B. M.'s naval service. And I direct that the said two-thirds do remain in the registry of this court, until letters of procuration shall be exhibited in due form of law to receive the same, or until further order. And I further decree that the remaining three-fourths of the value of the brig Huntress and her cargo be charged with the taxable costs of this case, and that the residue thereof be paid to the claimant, John R. Rue. Decree accordingly.

[On appeal to the circuit court the decree of the district court was modified, as respects the amount of salvage awarded. See Case No. 11,971.]